**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

|  |  |  |
|---|---|---|
| **NEW YORK LIFE INSURANCE COMPANY,** | ) ) ) |  |
| **Plaintiff/Counter-Defendant,** | ) ) |  |
| **v.** | ) ) ) | **CIVIL ACTION NO. 5:14-CV-101 (MTT)** |
| **DEAN GRANT,** | ) ) ) |  |
| **Defendant/Counter-Claimant.** | ) ) |  |

## ORDER

New York Life Insurance Company and Dean Grant have both moved for summary judgment. (Docs. 52; 47). For the following reasons, New York Life's motion is **GRANTED in part** and **DENIED in part**, and Grant's motion is **DENIED**.

### I.   BACKGROUND

Grant worked as an Agent for New York Life from October 7, 1988 to December 31, 2013. (Doc. 66-14 at ¶¶ 1, 3). He worked as a District Agent from March 6, 2000 to July 31, 2013. (Doc. 66-14 at ¶¶ 4-5). As an Agent, Grant received commissions based on his own sales of New York Life products, and as a District Agent, he received override commissions based on sales by other agents within his District Agent Unit. (Doc. 65-2 at ¶¶ 5-6, 23-24). Although Grant was ordinarily not entitled to receive a commission until the premium had been paid by an insured, he could, on occasion, request an advance payment of a commission. (Doc. 54 at 197:6-25). Moreover, under certain circumstances, such as if an insurance policy was rescinded, declined or cancelled, Grant was obligated to reimburse New York Life. (Doc. 65-2 at ¶¶ 14, 27). For each of its Agents, New York Life maintains an electronic balance sheet, or Ledger,

which "is credited with the Agent's compensation payments and is debited with the Agent's compensation reversals, benefit deductions, taxes, and expenses."  (Docs. 65-2 at ¶ 66; 52-14 at ¶ 7).

New York Life claims that Grant's Ledger has a negative balance of $287,819.01. (Doc. 1 at ¶ 3).  Most of Grant's negative Ledger balance consists of advanced commissions he was paid based on his work with four policyholders during New York Life's "Term Conversion Campaign."  (Doc. 52-43 at 6).  Grant filed a second amended counterclaim against New York Life for negligent misrepresentation based on what occurred with these four policyholders, as well as claims for breach of contract, breach of implied covenant of good faith and fair dealing, breach of implied contract, quantum meruit, promissory estoppel, and attorney's fees.  (Doc. 43).  These claims are based on Grant's work with New York Life Agent Umang Patel and New York Life's modification of Grant's District Agent Agreement.  New York Life moves for summary judgment on its claim against Grant for breach of contract and on each of the seven counts of Grant's second amended counterclaim.  (Doc. 52-43 at 2).

New York Life also brings a claim for breach of fiduciary duty based upon Grant's actions before and after he terminated his relationship with New York Life.  (Docs. 1 at ¶¶ 37-40).  Grant moves for summary judgment on this claim and New York Life's claims for punitive damages and attorney's fees.  (Doc. 47).

A.    **Term Conversion Campaign**

In 2013, New York Life began a Term Conversion Campaign, which offered certain term life insurance policyholders "conversion credits" if they elected to convert their policy to a whole life insurance policy.  (Doc. 65-2 at ¶ 74).  These conversion

credits would be applied to the first premium due under the new policy. (Doc. 65-2 at ¶ 75). On March 25, 2013, Grant's assistant asked Jamie Bartholf, Service Manager in New York Life's Central Georgia General Office, to "find out how much the conversion credits" would be for six term life insurance policyholders. (Doc. 65-2 at ¶ 76). Bartholf responded that F.H. and M.H., two brothers who were each insured under a $20.5 million term life insurance policy, would be entitled to a conversion credit that was "100% of 1st year premium paid and doubled." (Doc. 65-2 at ¶¶ 77, 85). She also responded that M.H. and T.H., a married couple who were each insured under a term life insurance policy, would be entitled to a conversion credit that was "5% of the premium [they] are converting to … no double credits." (Doc. 65-2 at ¶¶ 77, 88). The parties agree that this information was correct. (Doc. 65-2 at ¶¶ 85, 88). Bartholf incorrectly responded, however, that F.H. would receive a conversion credit of $41,448 and his brother, M.H., would receive a conversion credit of $34,068. (Doc. 65-2 at ¶ 86).

Although Grant "considered [Bartholf] to be incompetent," he "did nothing to verify the information that she provided to [him]." (Docs. 65-2 at ¶¶ 89-90; 54 at 202:2-6). Grant met with the brothers, told them what the conversion credits would be, and said that the credits would be sufficient to cover the initial premiums for their whole life insurance policies. (Docs. 52-25 at 2; 54 at 200:2-7; 65-2 at ¶ 91). On March 27, 2013, New York Life received applications from the brothers to convert $15.5 million of their term life insurance policies to whole life insurance policies. (Doc. 65-2 at ¶ 92). New York Life issued whole life insurance policies for delivery to the brothers. (Doc. 65-2 at ¶ 94). On March 27, 2013, New York Life also received applications from the married

couple to convert their term life insurance policies to whole life insurance policies.  (Doc. 65-2 at ¶ 109).  New York Life issued a whole life insurance policy for T.H. but ultimately did not issue a whole life insurance policy for her husband, M.H.  (Docs. 52-14 at ¶ 30; 65-2 at ¶¶ 110-11).

On March 27, 2013, New York Life received and approved requests from Grant and Lisa Miller, an Agent in Grant's District Agent Unit, to pay commissions on the four whole life insurance policies.  (Doc. 65-2 at ¶¶ 113-14, 116).  That same day, New York Life issued a $226,660 check to Grant and credited Grant's Ledger with "Term Conversion Commission Advances" totaling $226,660, which consisted of $77,860 for F.H., $84,080 for his brother, M.H., $23,800 for T.H., and $40,920 for her husband, M.H.  (Doc. 65-2 at ¶¶ 117, 121).  New York Life also credited Grant's Ledger with override commissions totaling $198,738.07—$169,995 of which was attributable to the whole life policies issued to F.H., M.H., T.H., and M.H.  (Doc. 65-2 at ¶¶ 122-23).  On April 24, 2013, New York Life transferred $198,792.66 to Grant's bank account, which represented the District Agent override commissions.[1]  (Doc. 65-2 at ¶ 124).

On March 29, 2013, Bartholf realized, after receiving paperwork related to the issuance of the brothers' policies, that she had incorrectly calculated the conversion credits for the brothers.  (Docs. 65-2 at ¶ 97).  The policy billing statements for the brothers' whole life insurance policies, which are both dated March 29, 2013, list F.H.'s conversion credit as $21,224.96 and M.H.'s conversion credit as $17,133.  (Docs. 52-23; 65-2 at ¶¶ 95-96).  Bartholf informed Grant's assistant of the error, explaining that

---

[1] Notwithstanding Grant's admissions that New York Life issued a $226,660 check and made a $198,792.66 transfer, Grant submitted an affidavit in which he says, without any specificity, that "New York Life did not release the full amount of these funds to me" and that "New York Life withheld amounts owed to me in order to recoup the amounts of reversal commissions on my ledger balance."  (Doc. 65-1 at ¶¶ 18-19).

"the numbers I gave you were based on current year not first year premiums so the calculations were different." (Docs. 52-20 at 2; 65-2 at ¶¶ 98-99). The brothers refused to accept delivery of the $15.5 million whole life insurance policies. (Doc. 65-2 at ¶ 101).

Because New York Life provided incorrect conversion credits, it prepared accommodation agreements in an attempt "to make the [brothers] whole." (Docs. 51 at 86:22-24; 52-14 at ¶ 20; 65-2 at ¶ 103). According to Chadd French, a New York Life employee, "New York Life offered to make up the difference between the conversion credits incorrectly quoted and the conversion credits to which they were contractually entitled, so that the whole life insurance policies could be issued at no additional cost to F.H. and M.H." (Doc. 52-14 at ¶ 20). Because the first premium for F.H.'s whole life insurance policy would be $24,602.92, and the correct conversion credit was $21,224.96, New York Life offered to issue F.H. a $3,377.96 check to cover the difference. (Docs. 52-14 at ¶ 21; 52-25 at 2; 65-2 at ¶ 104). Because the first premium for M.H.'s whole life insurance policy would be $28,026.56, and the correct conversion credit was $17,133, New York Life offered to issue M.H. a $10,893.56 check to cover the difference. (Docs. 52-14 at ¶ 22; 52-25 at 2; 65-2 at ¶ 104). The checks were to be issued "only after [the brothers] each submit[ted] a check to [New York Life] for the applicable amount to pay the short fall on the first premium." (Doc. 52-25 at 2).

The brothers did not sign the accommodation agreements. (Docs. 52-14 at ¶ 26; 65-2 at ¶ 105). They did not proceed with the conversions of their term life insurance policies, and so their whole life insurance policies were not placed in force. (Docs. 52-14 at ¶ 26; 65-2 at ¶ 106). The whole life insurance policy for T.H. was also not placed

in force.  (Docs. 52-14 at ¶ 30; 65-2 at ¶ 110).  On May 15, 2013, the Term Conversion

Commission Advances for the four policies were reversed on Grant's Ledger, which

resulted in an ending balance of negative $225,984.95.  (Doc. 65-2 at ¶¶ 125-26).

Grant admits that "[i]f the conversion of the term life policies to whole life policies did not

happen, [he] would not earn a commission."  (Docs. 54 at 196:19-22; 65-2 at ¶ 120).

He testified that he is not claiming that he "should be entitled to keep the advance

commission that was paid to [him]."  (Doc. 54 at 208:24-209:4).  Rather, Grant testified:

> Q.  What are you claiming?
>
> A.  I believe that New York Life has a responsibility in poisoning the well on this
> sale and that I do believe that I am due something.
>
> Q.  What do you think you are due?
>
> A.  I don't know that number.  I am not asking New York Life to pay me the entire
> amount.
>
> Q.  What part of it are you asking New York Life to pay you?
>
> A.  I don't know the answer to that.
>
> Q.  When will you know the answer?
>
> A.  I don't know.

(Doc. 54 at 209:5-16).

### B.    Grant's District Agent Unit and New York Life Agent Umang Patel

New York Life's District Agent Program "offers well-established Agents the

opportunity to mentor a unit of Agents and to receive additional commissions … while

continuing personal production."  (Docs. 52-1 at ¶ 10; 65-2 at ¶ 15).  Grant and New

York Life operated under the terms of a District Agent Agreement from March 6, 2000 to

July 21, 2013.  (Docs. 52-1 at ¶ 10; 52-4; 65-2 at ¶ 18).  That agreement provides:

> <u>District Agent Recommendation and Appointment</u>.  The District Agent agrees to select, recruit and recommend the appointment of Agents to New York Life, provided however New York Life, in its sole discretion, may refuse to appoint or revoke an appointment for any reason or no reason at all. … <u>District Agent Responsibility</u>.  New York Life will have sole responsibility for the training and supervision of Agents who are selected for appointment pursuant to this Agreement.  However, the District Agent agrees to promote and foster the need for product training and will support [New York Life's] efforts in the development of Agents who are part of the District Agent Unit.

(Doc. 52-4 at 2).  The District Agent Agreement defines "District Agent Unit" as "those Agents who were recommended by the District Agent, contracted by New York Life as a result of the District Agent's recommendation and assigned to the District Agent."  (Doc. 52-4 at 5).  Schedule A of the District Agent Agreement provides for several categories of override compensation, including New Agent Override, Base Override, and Development Override.  (Docs. 52-4 at 6; 65-2 at ¶¶ 23, 25).  According to the District Agent Agreement, "New York Life will have the right to change or modify Schedule A, including Exhibits I, II and III, by giving the District Agent thirty (30) days' written notice."  (Doc. 52-4 at 4).

Umang Patel began working as an Agent for New York Life on January 29, 2008.  (Doc. 65-2 at ¶ 42).  The Managing Partner of New York Life's Central Georgia General Office, Amelia Scott, recruited and recommended Patel to New York Life.  (Docs. 52-7 at ¶ 16; 65-2 at ¶ 46).  As his "Recruiter," Scott was entitled to "Recruiting Credits," which is "a fee based on Patel's sales of New York Life products during the first 36 months of Patel's Agent's Contract."  (Docs. 52-7 at ¶ 20; 65-2 at ¶ 49).  If Scott had been a District Agent rather than a Managing Partner, New York Life would have paid the same fee but identified it as a "New Agent Override."  (Docs. 52-7 at ¶ 10; 65-2 at ¶

50).  According to New York Life, Patel was not assigned to a District Agent Unit.
(Docs. 52-7 at ¶ 19; 65-2 at ¶ 43).

      Grant "disputes that New York Life did not assign Patel to a District Agent Unit."
(Doc. 65-2 at ¶ 43).  According to Grant, "New York Life asked Grant to mentor, groom
and train Umang Patel and paid Grant commissions/overrides, although not the full
amount to which Grant was entitled under his District Agent Agreement."  (Doc. 65-2 at
¶ 43).  Grant relies on his District Agent Reports, which list Patel as an "Agent[] in D.A.'s
unit."  (Docs. 52-5 at 8-9, 14-19, 21; 65-2 at ¶ 43).  He also suggests that certain
correspondence between himself, Scott, and Richard Simonetti, a New York Life
employee, serves as "evidence that the transfer of Agent Patel to [his] District Agency
was effected."  (Docs. 52-7 at ¶¶ 21-22; 65-2 at ¶ 43).  Finally, Grant submitted an
affidavit in response to New York Life's motion for summary judgment, which details his
relationship with Patel.  (Doc. 65-1).

      Grant states the following in his affidavit.  He and Scott both spoke with Patel's
father, H.P., who is a New York Life Agent, "about entering into the District Agent
program and hiring [Patel] as a producer in H.P.'s District Agency Unit."  (Doc. 65-1 at ¶
3).  To be eligible to enter the District Agent program, H.P was required to pass certain
securities examinations, and so he began this process.  (Doc. 65-1 at ¶ 4).  Scott asked
Grant "on H.P.'s behalf" if Grant "would consider having [Patel] in [his] District Agent
Unit if H.P. was unable to pass the securities exams."  (Doc. 65-1 at ¶ 5).  Grant "agreed
to such request and informed both H.P. and Amy Scott."  (Doc. 65-1 at ¶¶ 6, 9).  "At that
time," Grant "considered [Patel], who had been an agent for several months, to be a
part of [his] District Agent Unit."  (Doc. 65-1 at ¶ 6).  Grant "invested considerable time in

including [Patel] as a part of [his] District Agency Unit and offered guidance on many

occasions."  (Doc. 65-1 at ¶ 8).  Patel also attended, at Grant's invitation, "numerous

training meetings at various locations," many of which Grant conducted himself.[2]  (Doc.

65-1 at ¶ 7).  Grant further explains that he repeatedly asked Scott about Patel's status,

including after H.P. told him he could not pass the securities exams, and was told that

"the placement would occur."  (Doc. 65-1 at ¶¶ 10, 12-13).

> On February 15, 2010, Scott wrote to Simonetti:

> I need your assistance/guidance with an agent. [Patel] was recruited to be
> in [H.P.'s] unit.  As you know due to [H.P.] not passing the [securities
> exams], we weren't able to offer him the … DA … .  Over the past few
> months [Grant] has been working with [Patel] and [H.P.] as a
> mentor/coach.  I would like to move [Patel] into [Grant's] DA unit effective
> 1/1/2010.  I feel this is the right thing to do for all parties.  Currently I am
> his recruiter.  Please let me know what we can do to accomplish this.

(Docs. 52-12 at 5; 65-2 at ¶ 51).  Simonetti replied, "Let me see what I can do. I

will get back to you this week."  (Doc. 52-12 at 5).  On March 29, 2010, Grant

wrote to Simonetti:

> I encouraged [H.P.] to look into the DA program when he was going to
> bring [Patel] into this business last year. … In the interim, we had [Patel]
> listed under [Scott] until [H.P.] passed his securities exams and could then
> be admitted into the DA program. … [H.P.] cannot pass the securities
> exams and has completely given up on that.  His original intent was for
> [Patel] to be in my DA unit so that I would be [Patel's] mentor and help
> develop [Patel] within the business markets.  For some reason, we are
> having trouble getting [Patel] transferred into my DA unit as was originally
> intended. … Can you please help me with this?

---

[2] New York Life submitted an affidavit by Patel with its motion for summary judgment.  (Doc. 52-9).  Patel
states that he attended "two or three meetings" with Agents assigned to Grant's District Agent Unit.  (Doc.
52-9 at ¶ 9).  He "assume[s]" that for one of the meetings Grant paid for his food, lodging, tickets to a
baseball game, and incidental expenses.  (Doc. 52-9 at ¶ 10).  Otherwise, Patel states that Grant did not
provide him with any one-on-one training, prospects, or leads, refer him any potential clients, go on any
sales calls with him, or supervise his activities.  (Doc. 52-9 at ¶ 11).

(Doc. 52-12 at 3).  Richard Conk, a New York Life employee, recommended to Simonetti that it was not "a good idea to transfer [Patel], since [Grant] was not responsible for contracting him and he is already in his 26th contract month."  (Docs. 52-7 at ¶¶ 23-24; 52-12 at 2).

According to Simonetti, he "left a voicemail message for [Grant], stating that [Patel] would not be assigned to his District Agent Unit."  (Doc. 52-7 at ¶ 26).  On April 13, 2010, Grant wrote to Simonetti, "Got you[r] voicemail that you [w]on't be able to do what I asked.  Please let me know what I need to do on this end to achieve what you said you [c]ould do."  (Docs. 52-7 at ¶ 27; 52-13 at 3).  New York Life then made "an accommodation" for Grant: it agreed to transfer him Scott's remaining Recruiting Credits.  (Doc. 52-7 at ¶ 28).  Simonetti asked Scott to "approve the transfer of [her] R's so [Grant] can get the New Org Override for the remainder of [Patel's] term as a new org agent," and Scott approved the transfer.[3]  (Doc. 52-13 at 2-3).  According to New York Life, this accommodation was made because Grant was "a large producer of business" and Scott had requested the transfer.  (Doc. 52-7 at ¶ 28).

Grant was paid $36,462.85 based on Patel's sales.  (Doc. 65-2 at ¶ 60).  This amount equals Scott's remaining Recruiting Credits as well as the amount of New Agent Overrides that Grant would have been entitled to if Patel had been assigned to his District Agent Unit.  (Docs. 52-7 at ¶ 38; 65-2 at ¶ 60).  According to New York Life, it treated the Recruiting Credits transferred to Grant as New Agent Overrides, "even though [Grant] was not contractually entitled to New Agent Overrides or any other [o]verride based on [Patel's] sales because [Patel] was not in his District Agent Unit."

---

[3] According to Simonetti, the reference to "R's" was to Recruiting Credits, and the reference to "New Org Override" was to New Agent Override.  (Doc. 52-7 at ¶ 29).

(Doc. 52-7 at ¶¶ 31-34).  New York Life treated the Recruiting Credits this way because Recruiting Credits "are not payable to District Agents," and so the accommodation "presented an accounting problem for New York Life."  (Doc. 52-7 at ¶ 31).  "For accounting purposes only," New York Life added Patel's name to Grant's District Agent Unit in its software program that calculates District Agent override commissions.  (Doc. 52-7 at ¶ 34).  This allowed New York Life to calculate the Recruiting Credits transferred to Grant.  (Doc. 52-7 at ¶ 35).  New York Life then "manually overr[o]de the system" to remove any other override commissions that were attributable to Patel's sales.  (Doc. 52-7 at ¶¶ 36-37).  New York Life points out that although Patel's name appeared in Grant's District Agent Reports, it did not appear in Grant's District Agent and District Agent Associate Status Reports, which "identifie[d] those individual Agents who were assigned by New York Life to [Grant's] District Agent Unit as part of the Unit's sales force."  (Docs. 52-7 at ¶ 40; 65-2 at ¶ 62).

Finally, Grant claims that New York Life breached the District Agent Agreement based on two changes it made "without the proper written notice."  (Doc. 43 at ¶¶ 19-20).  First, in 2003, New York Life modified Schedule A by changing the override compensation schedule for District Agents.  (Docs. 52-1 at ¶¶ 13-14; 65-2 at ¶ 29). New York Life paid, and Grant accepted, override commissions pursuant to this modification until Grant terminated his District Agent Agreement.  (Doc. 65-2 at ¶ 32). New York Life claims that it made all of its District Agents aware of the modification "by several means," including through its District Agent Reports.  (Docs. 52-1 at ¶ 15; 65-2 at ¶ 30).  These reports identify the rate used to calculate each type of override compensation paid to the District Agent.  (Docs. 52-1 at ¶ 15; 65-2 at 31).  New York

Life attached copies of several of the reports to its motion for summary judgment.  (Doc. 52-5).  Grant "disputes that such reports provided notice of [the] modification as alleged by [New York Life]."  (Doc. 65-2 at ¶¶ 30, 31).

Second, in 2013, New York Life decided to limit District Agent Units to 10 active Agents.  (Docs. 52-1 at ¶ 18; 65-2 at 33).  Grant claims that this change alongside the change in override compensation "resulted in a substantial decrease in the profitability of [his] District Agency."  (Doc. 43 at ¶ 20).  It is undisputed that New York Life notified its District Agents, including Grant, of this limit.  (Doc. 65-2 at ¶ 34).  According to New York Life, it decided not to apply the limit to Grant's District Agent Unit and informed him that he would be exempt from it.  (Docs. 52-1 at ¶ 20; 65-2 at ¶¶ 36-37).  Grant disputes this.  (Doc. 65-2 at ¶¶ 36-37).  He says that he "did not receive verbal or written notice that he would be exempt from the 10-Agent limit" and that "[t]he limitation cap was, in fact, verified by [his] Managing Partner and Mike Hershberg."  (Docs. 54 at 122:20-123:19; 65-1 at ¶ 17; 65-2 at ¶ 37).

## II.      DISCUSSION

### A.      Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Id.*  The party may support

its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438.  In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict.  *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'"  *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk*

*S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted).  The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B.   Analysis**

**1.   New York Life's Motion for Summary Judgment**

New York Life moves for summary judgment on its claim against Grant for breach of contract.  (Doc. 52-43 at 2).  In Count I of its complaint, New York Life claims

that Grant's failure to pay it $287,819.01, "which is the balance owed to New York Life in Grant's agent ledger," constitutes a material breach of contract.  (Doc. 1 at ¶ 31). According to New York Life, Grant's Ledger balance was $281,912 as of June 4, 2015. (Docs. 52-14 at ¶ 9; 52-43 at 6).  New York Life acknowledges that "[t]he amount owed by Grant has fluctuated due to additional credits and debits posted to his Ledger," and so it "seeks summary judgment for the Ledger balance due on the date of judgment." (Doc. 52-43 at 1 n.1).  Grant responds that there is a genuine dispute over the amounts owed pursuant to his contractual relationship with New York Life.  (Doc. 65 at 4).

Neither party has produced a signed copy of Grant's Agent's Contract. According to New York Life, "Grant and New York Life entered into an Agent's Contract (Form QN6-82) effective October 7, 1988," and the parties operated under the terms of that agreement until Grant terminated it.  (Doc. 52-1 at ¶ 6).  Grant admits that he "entered into an Agent's Contract (form number QN6-82) effective October 7, 1988" and that his "agent's contract remained the same."  (Docs. 43 at ¶ 6; 54 at 74:17-75:4, 91:12-21).  Thus, in support of its motion, New York Life relies on several provisions of a copy of the form of Grant's Agent's Contract (Form QN6-82) and the Agent's Handbook that the form incorporates.  (Docs. 52-2; 52-3; 52-42 at ¶¶ 2-14). Notwithstanding Grant's admissions, Grant responds to New York Life's invocation of these provisions by disputing that "Form QN6-82 accurately represents such contractual relationship to the extent such form has not been proven to be the Agent's Contract which Grant signed, therefore the particulars of the contractual relationship are in dispute."  (Doc. 65-2 at ¶¶ 1-14).

Although Grant argues that "the exact content" of his Agent's Contract has not been proven, he "does not dispute that a contractual relationship existed between the parties." (Doc. 65 at 1-2). Grant testified that he "received commissions because [he] had a contract with New York Life." (Doc. 54 at 98:16-19). In fact, Grant testified that, "[u]nder normal circumstances," he would not be contractually entitled to keep the advanced commissions he was paid for the brothers' policies. (Doc. 54 at 208:24-209:4). Grant does, however, testify that New York Life "did not release the full amount of these funds to [him]" and that his Ledger balance was not $281,912 as of June 4, 2015. (Doc. 65-1 at ¶¶ 18-20). Grant further argues there is a genuine dispute "regarding whether or not [Patel] was, in fact, placed in [his] District Agent Unit." (Doc. 65 at 8). If Patel was placed in his District Agent Unit, Grant argues that, pursuant to the terms of his District Agent Agreement, he would be "contractually entitled" to override commissions he has not been paid. (Doc. 65 at 7-9). This would likewise impact the Ledger balance. (Doc. 65 at 9).

Because the Court cannot say that there is no genuine dispute as to the amount Grant owes under his Ledger balance, New York Life is not entitled to judgment as a matter of law on Count I of its complaint.

New York Life moves for summary judgment on each of the seven counts of Grant's second amended counterclaim. (Doc. 52-43 at 2). In Counts IV, V, and VI, Grant claims that New York Life is liable for breach of implied contract, quantum meruit, and promissory estoppel based on its representations that Patel would be placed in his District Agent Unit. New York Life argues that these claims fail as a matter of law because of the District Agent Agreement. (Doc. 52-43 at 13-16). Grant does not

dispute the validity of the District Agent Agreement, and he admits it governs the amount of override commissions he would be entitled to if Patel was placed in his District Agent Unit.  As discussed, Grant argues he is entitled to these commissions because Patel was, in fact, placed in his District Agent Unit.  Grant simply argues that, in the event Patel was not placed in his District Agent Unit, he should still be able to recover under these alternative theories.  (Doc. 65 at 15).

"There cannot be an express and implied contract for the same thing existing at the same time between the same parties.  A plaintiff is estopped to recover on quantum meruit where there exists an express agreement."  *Ga. Real Estate Props., Inc. v. Lindwall*, 303 Ga. App. 12, 15, 692 S.E.2d 690, 693 (2010) (citation omitted); *see also Lord Jeff Knitting Co. v. Lacy*, 195 Ga. App. 287, 287, 393 S.E.2d 55, 56 (1990).  Grant's quantum meruit claim must fail because he and New York Life "had an express contract on this very subject matter."  *B & R Realty, Inc. v. Carroll*, 245 Ga. App. 44, 47, 537 S.E.2d 183, 187 (2000).  Grant argues that his "promissory estoppel claim provides the lacking consideration for the agreement to develop [Patel]."  (Doc. 65 at 10).  But "where a plaintiff seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy."  *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1326 (11th Cir. 2005) (citing *Bank of Dade v. Reeves*, 257 Ga. 51, 354 S.E.2d 131 (1987)); *see also Wheeler v. Cagle Foods JV, LLC*, 148 F. App'x 760, 762 (11th Cir. 2005) ("Promissory estoppel is not a legal doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." (citation omitted)).

Accordingly, New York Life is entitled to summary judgment on Counts IV, V, and VI of Grant's second amended counterclaim.

In Count I of his second amended counterclaim, Grant claims that New York Life breached the District Agent Agreement by reducing the amount of override compensation in 2003 and limiting the number of active Agents assigned to a single District Agent Unit in 2013.  (Docs. 43 at ¶¶ 19-20, 23-28; 65 at 9).  In Count II, Grant claims that these changes also breached the implied covenant of good faith and fair dealing.  (Doc. 65 at 10).  As to the reduction in override compensation, New York Life argues that Grant's claim is barred by the statute of limitations and that Grant waived the 30-day notice requirement by continuing to perform under the District Agent Agreement.  (Doc. 52-43 at 9-10).  As to the limit on the number of Agents, New York Life argues that the limit did not apply to Grant and even if it did, Grant has not identified a provision of his District Agent Agreement that New York Life violated.  (Doc. 52-43 at 10-11).

Grant responds that the "impact" of the reduction in override compensation did not "accrue" until New York Life placed a limit on the number of Agents.  (Doc. 65 at 9). Because "[t]he time of breach controls, not the time the damages result or are discovered," Grant's breach of contract claim based on New York Life's modification in 2003 is barred by the six year statute of limitations.  *Dillon v. Reid*, 312 Ga. App. 34, 39, 717 S.E.2d 542, 547 (2011); *see* O.C.G.A. § 9-3-24.  Grant does not respond to New York Life's argument that he has failed to identify a provision of his District Agent Agreement that New York Life violated by limiting the number of Agents assigned to a single District Agent Unit.  Although Grant alleges in his second amended counterclaim

that New York Life made this change "without proper written notice," he does not argue that the provision in his District Agent Agreement allowing New York Life to change or modify Schedule A with appropriate written notice applies to this change by New York Life.  This is not surprising, as Grant admits that New York Life notified him of its decision.  (Doc. 65-2 at ¶ 34).  Moreover, Grant expressly argues that the provision in his District Agent Agreement allowing New York Life to "refuse to appoint or revoke an appointment for any reason" does not address "the placement of agents in a certain District Agency."  (Docs. 52-4 at 2; 65 at 9).  Because Grant has failed to identify a contractual provision that New York Life breached as a result of its decision to limit the number of Agents assigned to a single District Agent Unit, his breach of contract claim based on this decision fails as a matter of law.

Because Grant "has no viable claim for breach of his express contracts," New York Life argues that Grant's claim for breach of the implied covenant of good faith and fair dealing fails.  (Doc. 52-43 at 13).  The Court agrees.  "The implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself.  As such, the covenant is not independent of the contract."  *Stuart Enters. Int'l, Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 234, 555 S.E.2d 881, 884 (2001).  Accordingly, New York Life is entitled to summary judgment on Counts I and II of Grant's second amended counterclaim.

Finally, in Count III, Grant claims that New York Life is liable under the theory of negligent misrepresentation for negligently supplying false information regarding conversion credits and Patel's placement in his District Agent Unit.  (Docs. 43 at ¶¶ 35-38).  Grant alleges that in reliance on the conversion credits supplied by Bartholf, he

"expended time and effort in meeting with [the brothers] in order to persuade them to convert their policies."  (Doc. 43 at ¶ 18).  Similarly, Grant alleges that in reliance on New York Life's representations that Patel would be officially transferred to his District Agent Unit, he "invested in the training and grooming of [Patel]."  (Doc. 43 at ¶ 21).  As evidence of the injuries he sustained, Grant relies solely on the commissions and override compensation to which he would have been contractually entitled had the brothers converted their policies and Patel been transferred to his District Agent Unit. (Doc. 65 at 17-18).

"The essential elements of negligent misrepresentation are '(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" *Marquis Towers, Inc. v. Highland Grp.*, 265 Ga. App. 343, 346, 593 S.E.2d 903, 906 (2004) (citation omitted).  "[T]he reasonable reliance that is required to state a negligent misrepresentation claim is equivalent to that needed in the fraud context."  *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1030 (11th Cir. 2003).  Moreover, "the amount of damages awarded for negligent misrepresentation is measured by an 'out-of-pocket' standard," rather than a benefit-of-the-bargain standard.  *BDO Seidman, LLP v. Mindis Acquisition Corp.*, 276 Ga. 311, 311, 578 S.E.2d 400, 401 (2003) (citing Restatement (Second) of Torts § 552B).  "The out-of-pocket measure of damages is consistent with Georgia's general measure of damages in negligence cases, which seeks to place the injured party in the same place it would have been had there been no injury or breach of duty."  *Id.* at 312, 578 S.E.2d at 401.

Grant has made clear that the damages he seeks for New York Life's alleged misrepresentations is the loss of commissions and override compensation he says he would have earned under his contracts with New York Life.  Although he denies in his brief that he is seeking benefit-of-the-bargain damages, he then says that "the commissions and [o]verride compensation provide a reasonable formula for determining the amount of damages sustained" as a result of the misrepresentations.  (Doc. 65 at 17).  More to the point, in a hearing addressing New York Life's efforts to discover Grant's financial information, Grant's counsel informed the Court that the only damages that Grant was seeking for any of his claims would be "calculated by the amount of lost compensation of New York Life products.  Lost commissions."  (Doc. 40 at 8:21-9:1).  When New York Life persisted in its efforts because it understood Grant was claiming that he had been damaged in other ways, counsel reaffirmed that the only measure of damages was "the loss of commissions, both as a general agent and a district agent." (Doc. 40 at 13:5-14:2).  Because Grant was not seeking to recover anything other than lost commissions (including override compensation), the Court did not allow New York Life to discover Grant's financial records.

Thus, Grant's protest notwithstanding, he clearly seeks the benefit of the bargains he says he would have somehow realized but for the misrepresentations.  That is not recoverable in a negligent misrepresentation claim.  *See BDO Seidman, LLP*, 276 Ga. at 312, 578 S.E.2d at 401.  Although Grant has testified that he incurred some expense and expended some effort because of his understanding that Patel would be placed in his District Agent Unit, items which might be considered out-of-pocket damages, he has expressly disavowed any effort to recover those alleged out-of-pocket

damages.  (Docs. 54 at 221:21-25; 65-1 at ¶¶ 2-14).  Again, he seeks only the benefit of the alleged bargains, an item of damages not available in a negligent misrepresentation claim.

Accordingly, New York Life is entitled to summary judgment on Count III of Grant's second amended counterclaim.  Because all of Grant's claims fail, New York Life is entitled to summary judgment on Grant's claim for attorney's fees, Count IX.

### 2.    Grant's Motion for Summary Judgment

Grant moves for summary judgment on New York Life's claims for breach of fiduciary duty, punitive damages, and attorney's fees.  (Doc. 47).  New York Life claims that Grant breached his fiduciary duties by (1) inducing the Agents in his District Agent Unit to terminate their contracts with New York Life; (2) using New York Life's information to replace New York Life business with the business of other insurance companies; and (3) preparing for and operating a competing business while still an Agent of New York Life.  (Docs. 1 at ¶¶ 22-26; 66 at 2-3).  "To support a claim of breach of fiduciary duty, a plaintiff must prove the existence of such duty, breach of that duty, and damages proximately caused by the breach."  *Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587, 594, 726 S.E.2d 779, 787 (2012).

In his initial motion for summary judgment, Grant argues there is no evidence that he breached a fiduciary duty or that New York Life was damaged by his conduct. (Doc. 48).  He argues "[a]n employee's fiduciary duty to his employer extends only to such term of employment with the employer" and so he could have breached his fiduciary duty only through conduct prior to his resignation on December 31, 2013. (Doc. 48 at 4) (citing *Hanson Staple Co., Inc. v. Eckelberry*, 297 Ga. App. 356, 358 n.6, 677 S.E.2d 321 (2009)).  Because Grant did not raise the issue of whether a fiduciary

duty in fact existed, New York Life responds that Grant "tacitly concedes" he owed fiduciary obligations to New York Life at least until December 31, 2013. (Doc. 66 at 3). In his reply, Grant admits he did not "acknowledge or address the scope of the fiduciary duty owed to [New York Life]" in his initial motion. (Doc. 69 at 1). Yet Grant then relies on the terms of the form of his Agent's Contract (Form QN6-82) to argue that he "is a mere independent contractor of [New York Life] and not a legal 'agent' or 'employee' through which a fiduciary obligation can be affixed." (Doc. 69 at 2). "Arguments made for the first time in a reply brief are not properly before the Court." *Mack v. The Hous. Auth. for the City of Athens, Ga.*, 2010 WL 797211, at *3 n.2 (M.D. Ga.).

Even if Grant had properly raised this issue, the Court cannot say that "the facts are patent, unambiguous, and undisputed … [and] decide the issue of a confidential relationship as a matter of law." *Middleton v. Troy Young Realty, Inc.*, 257 Ga. App. 771, 773, 572 S.E.2d 334, 337 (2002). "[T]he existence of a confidential or fiduciary relationship is generally a factual matter for the jury to resolve." *Bienert v. Dickerson*, 276 Ga. App. 621, 624, 624 S.E.2d 245, 248-49 (2005). It is clear that Grant operated his own business as an independent contractor. (Docs. 52-4 at 3; 52-7 at ¶¶ 4, 6). While an independent contractor relationship does not necessarily give rise to a fiduciary relationship, it does not preclude a fiduciary relationship either. *See Automated Sols. Enters., Inc. v. Clearview Software, Inc.*, 255 Ga. App. 884, 888, 567 S.E.2d 335, 338 (2002); *Gilmore v. Bell*, 223 Ga. App. 513, 514, 478 S.E.2d 609, 611 (1996) ("[A]ll the law requires is a showing of a relationship which justifies the reposing of confidence by one party in another."). Here, Grant was a full-time Agent of New York Life "whose primary business activity [was] selling life insurance policies and annuity

policies issued by New York Life," and New York Life treated Grant as an employee for employment tax purposes and provided him "medical benefits, dental benefits, life insurance, and long-term disability insurance under [its] Agents Group Plan."  (Doc. 66-1 at ¶¶ 8-10).  Additionally, Grant had access to New York Life's proprietary information, the use of which was restricted by his contract with New York Life, and Grant's District Agent Agreement contained several restrictive covenants.  (Docs. 66-1 at ¶¶ 18-21; 52-4).  Accordingly, a jury could find that a confidential relationship existed between New York Life and Grant with respect to the issues raised by New York Life in its breach of fiduciary duty claim.  *See Gordon Document Products, Inc. v. Serv. Techs., Inc.*, 308 Ga. App. 445, 454, 708 S.E.2d 48, 56 (2011) (citing *Atlanta Mkt. Ctr. Mgmt., Co. v. McLane*, 269 Ga. 604, 607, 503 S.E.2d 278, 281-82 (1998)).

With respect to the issue of breach, Grant acknowledges that "an employee 'is not … entitled to solicit customers for a rival business before the end of his employment,'" but he argues there is no evidence that he "solicited any customers of New York Life while still under its employ."  (Doc. 48 at 7) (citing *Hanson Staple*, 297 Ga. App. at 359).  In response, New York Life has produced evidence suggesting that Grant attempted to conceal his involvement in at least one policy sold through a competing business to a New York Life policyholder prior to his resignation.  (Docs. 66 at 7; 66-11 at 275-78).  New York Life argues that the damages it sustained as a result of this breach would include any commissions earned for the replacement of its policy, which New York Life approximates to be at least $3,048.  (Doc. 66-1 at ¶ 35).  Grant does not address this evidence in his reply.[4]  New York Life has also produced

---

[4] In his reply, Grant shifts course and claims he was permitted to have business relationships with New York Life's competitors during the term of his contractual relationship with New York Life.  (Doc. 69 at 6-

evidence supporting its argument that Grant used New York Life's proprietary information for the purpose of replacing New York Life policies. (Docs. 66-1 at ¶¶ 25-31; 66 at 13-15). Accordingly, Grant is not entitled to summary judgment on New York Life's breach of fiduciary duty claim.

Grant's sole argument for why he is entitled to summary judgment on New York Life's punitive damages claim, Count IV, is that New York Life's breach of fiduciary duty claim fails. (Doc. 48 at 19-20). Because the breach of fiduciary duty claim does not fail, Grant is not entitled to summary judgment on New York Life's punitive damages claim.

Finally, Grant moves for summary judgment on New York Life's claim for attorney's fees and costs under the terms of Grant's Agent's Contract and O.C.G.A. § 13-6-11. (Docs. 1 at ¶¶ 44-47; 48 at 20-22). Both the Agent's Contract and Agent's Handbook clearly provide for the payment of attorney's fees and costs, and it is beyond reasonable dispute that Grant is bound by the terms of these agreements. (Docs. 52-2 at ¶ 7; 52-3 at 12). O.C.G.A. § 13-6-11 authorizes attorney's fees "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." Although Grant argues there is no evidence that he acted in bad faith or has been stubbornly litigious, there is a genuine dispute over whether this is the case. (Docs. 48 at 22; 66 at 17-18). Accordingly, Grant is not entitled to summary judgment on New York Life's claim for attorney's fees and costs.

---

10). He argues that "had [he] been forthcoming about his intended affiliation" with a competing business, he would not have necessarily been fired. (Doc. 69 at 9) (citing Doc. 51 at 124:15-125:4). Grant appears to be relying on the Agent's Handbook, which requires prior review and approval for certain outside business activities, including insurance brokering for other insurance companies, and provides that Agents "must avoid circumstances that might adversely affect or appear to affect their duty of loyalty to the Company." (Docs. 54-2 at 10-11; 66-1 at ¶ 8). Because Grant did not raise this argument in his initial motion, New York Life did not have an opportunity to respond to it. Nevertheless, based on the evidence presented by New York Life, the Court cannot say as a matter of law that Grant did not breach a fiduciary duty.

## III.    CONCLUSION

For the foregoing reasons, New York Life's motion for summary judgment (Doc. 52) is **GRANTED in part** and **DENIED in part**, and Grant's motion for summary judgment (Doc. 47) is **DENIED**.

**SO ORDERED**, this 28th day of March, 2016.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT